Davina Shoumer (Bar No. 358336)
Email: davina@coastkeeper.org
Erin Barlow (Bar No. 342212)
Email: erin@coastkeeper.org
Sarah Spinuzzi (Bar No. 305658)
Email: Sarah@coastkeeper.org
ORANGE COUNTY COASTKEEPER
INLAND EMPIRE WATERKEEPER
3151 Airway Ave F-110
Costa Mesa, CA 92626

*Attorneys for Plaintiffs Inland Empire Waterkeeper & Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of Orange County Coastkeeper, and ORANGE COUNTY COASTKEEPER, a California nonprofit public benefit corporation,<br><br>    Plaintiffs,<br><br>  v.<br><br>LUXFER INC., a Delaware stock corporation,<br><br>    Defendant. | Civil Case No. 8:25-cv-1368<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively, "Plaintiffs" or "Waterkeeper"), by and through counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    Plaintiffs bring this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*. (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365.

2.    This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United

States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

3.    On April 24, 2025, Plaintiffs issued a 60-day Notice of Violation and Intent to Sue letter ("Notice Letter"), attached hereto as Exhibit A and incorporated by reference herein, to Luxfer Inc. ("Defendant"), as owner and/or operator of the facility located at 1995 3rd Street, Riverside, CA 92507 ("Facility"). The Notice Letter informed Defendant of the violations of the CWA, and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020) (hereinafter, "General Permit" or "Permit") at the Facility. The Notice Letter informed Defendant of Plaintiffs' intent to file suit against Defendant to enforce the CWA and General Permit.

4.    The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region 9, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

5.    Sixty days have passed since the Notice Letter was sent via certified mail to Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA, US DOJ, nor the State of California have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter

and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the CWA and General Permit violations are located within this judicial district.

7.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the General Permit and the CWA resulting from industrial activities at the Facility.

## II.    **INTRODUCTION**

8.     This Complaint seeks relief for the Defendant's unlawful discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, Plaintiffs are informed and believe, and thereon allege, that Defendant's discharges of pollutants from the Facility enter a storm drain, a point source, which ultimately discharges into the Santa Ana River in Riverside, which then discharges into the Pacific Ocean (collectively, the "Receiving Waters"), Waters of the United States, in violation of the substantive and procedural requirements of the CWA and General Permit. These violations have been occurring since at least April 25, 2020, and are ongoing and continuous.

9.     With every significant rainfall event, large amounts of polluted storm water originating from industrial operations such as the Facility pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for a significant amount of the total pollution entering surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals such as aluminum, iron, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have

for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

**III.    PARTIES**

    **A.    Inland Empire Waterkeeper and Orange County Coastkeeper**

    10.    Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Founded in 1999, Orange County Coastkeeper is a nonprofit public benefit corporation organized under the laws of the State of California with its office located in Costa Mesa, California. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506. Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 8,216 members who live and/or recreate in and around the Santa Ana River watershed.

    11.    Waterkeeper's mission is to protect and enhance the water quality of the Upper Santa Ana River Watershed through programs of advocacy, education, research, restoration, and enforcement. Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, when necessary, directly initiates enforcement actions on behalf of itself and its members.

    12.    Members of Waterkeeper enjoy the waters that storm water from the Facility discharges into, including the Santa Ana River. Members of Waterkeeper use these waterways to participate in a variety of water sports and other activities including fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility harms Waterkeeper's members by negatively impacting their use and enjoyment of the Receiving Waters.

13.     Defendant's failure to comply with the procedural and substantive requirements of the CWA and General Permit, including discharging polluted storm water from the Facility, failing to report such pollution, and failing to improve the quality of storm water discharges from the Facility in accordance with the General Permit, degrades water quality and harms aquatic life in the Receiving Waters. Further, such actions and/or inaction impairs Waterkeeper members' use and enjoyment of those Receiving Waters, thus giving Plaintiffs standing on behalf of its members.

14.     The violations of the CWA and General Permit at the Facility are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and General Permit. The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities.

15.     Defendant's failure to comply with the procedural requirements of the CWA and General Permit means that Waterkeeper's members are unable to obtain statutorily required information on Defendant's storm water and storm water management practices. Thus, Plaintiffs face both informational harm and informational injury because the CWA and General Permit provide a right to information, but Defendant has often failed to provide such information, as detailed below. Further, such informational harm and injury gives Plaintiffs standing on behalf of its members.

16.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.     The Owner and/or Operator of the Facility**

17.     Information available to Plaintiffs indicates that the Facility is currently owned and operated by Luxfer Inc. located at 3016 Kansas Ave, Riverside, CA 92507.

18.     Information available to Plaintiffs indicate that Luxfer Inc. has owned and operated the Facility at all times relevant to this Complaint.

19.     Luxfer Inc., as owner and/or operator of the Facility, is the responsible party under the CWA.

20.     Plaintiffs are informed and believe, and thereon allege, that Luxfer Inc. is a stock corporation formed in Delaware and registered to do business in California.

21.     Plaintiffs are informed and believe, and thereon allege, that Luxfer Inc.'s registered agent for service of process is CSC Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Ste 150N, Sacramento, CA 95833.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act

22.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

23.     Section 301(b) of the CWA requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

24.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

25.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

26.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 120.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, and wetlands adjacent to navigable waters. *Id.*

27.    Section 505(a)(1) and Section 505(f) of the CWA provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

28.    Defendant is a "person" within the meaning of Section 502(5) of the CWA. *See* 33 U.S.C. § 1362(5).

29.    A third-party enforcement action for injunctive relief is authorized under Section 505(a) of the CWA. *See* 33 U.S.C. § 1365(a).

30.    Each separate violation of the CWA subjects the violator to a penalty up to $68,445 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 8, 2025. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

31.    Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    The General Permit**

32.    Section 402(p) of the CWA establishes a framework for regulating industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).

33.    States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C § 1342.

34.    California is a state authorized by the EPA to issue NPDES permits.

35.    In California, the State Board and nine regional water boards are charged with regulating pollutants to protect California's water resources and improve water quality. *See* Cal. Water Code § 13001.

36.    The General Permit is a statewide NPDES permit issued by the State Board pursuant to the CWA.

37.    The General Permit was issued on July 1, 2015, pursuant to Order No. 2014-0057-DWQ.

38.    On November 6, 2018, the State Board amended the General Permit with Order No. 2015-0122-DWQ, incorporating: 1) the Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use.

39.    In order to lawfully discharge storm water to waters of the United States in California, industrial dischargers must secure coverage under the General Permit and comply with its terms or obtain and comply with an individual NPDES permit. *See* General Permit Finding 12.

40.    Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* General Permit, Finding 17.

41.    Violations of the General Permit are violations of the CWA. *See* General Permit, Section XXI.A (Duty to Comply).

### C.    The General Permit's Technology-Based Effluent Limitations

42.    The General Permit's Effluent Limitations require dischargers covered by the General Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of BAT for toxic or non-conventional pollutants, and BCT for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, iron, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* General Permit, Effluent Limitation V.A.

43.    Pursuant to the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate

storm water pollution. 33 U.S.C. § 1311(b); General Permit, Effluent Limitation V.A.

44.     EPA's 2015 NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the General Permit via the Table 2 Numeric Action Levels ("NALs"). *See* General Permit, Monitoring, Sampling and Analysis, XI.B.

45.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. General Permit, Effluent Limitation V.A.

46.     The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; O&G – 15 mg/L; copper ("Cu") – 0.0332 mg/L; aluminum ("Al") – 0.75 mg/L; and zinc ("Zn") – 0.26 mg/L.

47.     The General Permit establishes annual NALs and instantaneous maximum NALs. The following annual NALs have been established under the General Permit: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; O&G – 15 mg/L; Cu – 0.0332 mg/L; Al – 0.75 mg/L; and Zn – 0.26 mg/L. An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0 – 9.0 standard units; TSS – 400 mg/L and O&G – 25 mg/L.

48.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks or NALs indicate that BMPs that meet BAT for toxic and non-conventional pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the Facility. *Id.*

### D.    The General Permit's Discharge Prohibitions

49.     The General Permit contains certain absolute prohibitions. The General

Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges," or "NSWDs"), which are not otherwise authorized by an NPDES permit, to waters of the United States. *See* General Permit, Discharge Prohibition III.B.

50.    Discharge Prohibition III.C. of the General Permit prohibits industrial storm water discharges and authorized NSWDs that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance.

E.    **The General Permit's Storm Water Pollution Prevention Plan Requirements**

51.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. General Permit, §§ I.J. (Finding 68), and X.B. The SWPPP must meet all of the requirements of the General Permit. *Id*., §§ X.A-H.; *see also id*., Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. *Id*. at § X.G.

52.    The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and    their    current responsibilities for developing and

implementing the SWPPP. *Id*. at § X.

53.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. at § X.

54.    The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. *Id*. at §§ X.A-B. The General Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. *Id*. at §§ X.B. and XV.

55.    The SWPPP and site map(s) must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id*. at X.B.1.

**F.    The General Permit's Monitoring Requirements**

56.    The General Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. *Id*. at §§ X.I and XI.

57.    The General Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all the requirements of the General Permit. *Id*. at §§ X.I and XI.A-D.

58.    The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the General Permit's

Effluent Limitations, Receiving Water Limitations, and Discharge Prohibitions. *See Id*. at § XI.

59.    An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants from the facility's discharges, and the MIP is evaluated and revised whenever appropriate to ensure compliance with the General Permit. *See id*.

60.    The General Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the Permit's terms. General Permit, § XI.B.

61.    Section XI.A.1 of the General Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution. *Id*.

62.    Section XI.A.2 of the General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odors, and the source of any pollutants in storm water discharges from the facility.

63.    Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See Id*. at § XI.A.3.

64.    The General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. *Id*. at § XI.B.4.

65.    Section XI.B.1 of the General Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.

66.    The General Permit requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year (July 1 to December

31), and two QSEs within the second half of each reporting year (January 1 to June 30). *Id*. at § XI.B.2.

67.    Each storm water sample must be analyzed for TSS, pH, O&G, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment—in addition to those required under the Standard Industrial Classification ("SIC") code. *Id*. at XI.B.6.

68.    Section XI.B.6.c of the General Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

69.    Section XI.B.6.f of the General Permit requires dischargers to analyze additional parameters required by the Regional Board.

70.    Section XI.B.6.e of the General Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs.

71.    Section XI.B.11 of the General Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via the Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty days of obtaining all results for each sampling event.

**G.    The General Permit's Exceedance Response Actions Requirements**

72.    Under the General Permit, facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances. *See Id*. at § XII.

73.    An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. *Id*. at § XII.A.1.

74.    An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous

maximum NAL range for pH. *Id*. at § XII.A.

75.    Upon receiving NOI coverage, all permittees are deemed in "Baseline status." *Id*. at § XII.B.

76.    A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id*. at § XII.C.

77.    Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *Id*. at § XII.C.

78.    By October 1 following commencement of Level 1 status, permittees are required to complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s), and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit. *Id*. at §§ XII.C.1.a-c.

79.    Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id*. at § XII.C.1.c.

80.    Based upon the Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. *Id*. at §§ XII.C.2.a.i-ii.

81.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id*. at §

XII.C.2.a.iii.

82.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id*. at § XII.C.2.b.

83.    A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. *Id*. at § XII.D.

84.    Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *Id*. at § XII.D.

85.    A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedances occurred. *Id*. at § XII.D.1.a.

86.    On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *Id*. at § XII.D.

87.    Dischargers with Level 2 status are required to annually update their Level 2 ERA Technical Reports based upon additional NAL exceedances of the same parameter and same drainage area, facility operational changes, pollutant source(s) changes, and/or information that becomes available via compliance activities. *Id*. at § XII.D.3.c.

88.    Dischargers with Level 2 status who submit one of the above demonstrations and have implemented BMPs to prevent future NAL exceedance(s) for the Level 2 parameter(s) shall return to baseline status for that parameter, if results from four subsequent consecutive QSEs sampled indicate no additional NAL exceedance(s) for that parameter(s). *Id*. at § XII.D.4.a.

89.    If future NAL exceedances occur for the same parameter(s), the Dischargers' Baseline status will return to Level 2 status on July 1 in the subsequent reporting year during which the NAL exceedance(s) occurred. *Id*.

### H.    The General Permit's Annual Reporting Requirements

90.    Section XVI of the General Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

91.    The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the applicable requirements of the General Permit, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *Id*. at § XVI.

92.    Annual Reports are certified by the legally responsible person under penalty of perjury.

## V.    FACTUAL BACKGROUND

### A.    The Facility's General Permit Coverage

93.    Plaintiff alleges that Luxfer Inc. has obtained General Permit coverage for the Facility since at least 2009, by submitting an NOI to the State Board.

94.    Plaintiff alleges that Luxfer Inc. submitted an updated NOI to SMARTS that is dated June 18, 2024.

95.    The Facility's NOI identifies the operator of the Facility as Luxfer Inc. located at 3016 Kansas Ave, Riverside, CA 92507.

96.    The Facility's NOI lists the Facility site size as 290,000 square feet, with 5 acres of industrial area exposed to storm water.

97.    The Waste Discharger Identification ("WDID") number listed on the Facility's most recent SWPPP revised on February 26, 2020 and uploaded to SMARTS is 8 33I007059.

98.    The Facility's operating hours, per the Facility SWPPP, are 24 hours per day,

5 days per week, with some areas of the facility working 7 days per week.

99.    The Facility's NOI lists the Pacific Ocean as the Facility's receiving water.

100.    SMARTS lists the Facility's coverage under the General Permit as "Active."

101.    The Facility's NOI lists the SIC code for the Facility as 3354 (Aluminum Extruded Products).

102.    Defendant must obtain General Permit coverage for the entire facility. *See* General Permit, § XVII.E.1.

103.    Plaintiffs are informed and believe, and thereon allege, that Defendant is required to sample for pH, O&G, TSS, additional parameters that serve as indicators of the presence of all industrial pollutants likely to be present in discharges, additional applicable industrial parameters related to 303(d) listed impairments, and additional parameters required by the Santa Ana Regional Board. General Permit, § XI.B.6.

**B.    Industrial Activities and Pollutant Sources at the Facility**

104.    Plaintiffs are informed and believe, and thereon allege, that Defendant manufactures aluminum liners and high-pressure composite and steel cylinders.

105.    Plaintiffs are informed and believe, and thereon allege, that Defendant's industrial activities include saw cutting of aluminum tubes, application of tubes, drawing and pressing of aluminum tubes and plates, washing operations, spin forming, heat treatment of aluminum, filament winding, resin curing, sanding, hydrostatic pressure testing, hot water cleaning, gel coating, inspection, and cycle testing of finished composite cylinders.

106.    Plaintiffs are informed and believe, and thereon allege, that additional sources of pollution occurring at the Facility include aluminum dust collectors, metal scrap bins, cardboard bailing, outside storage of aluminum tubes, media blast, trash collection bins, waste water evaporators, waste water storage tanks, trim saws, aluminum liner ID rework stations, outside storage of maintenance equipment, composite cylinder burst testing, and air compressors.

107.   Plaintiffs are informed and believe, and thereon allege, that Defendant uses high-technology materials like carbon fiber, magnesium, and zirconium in their production.

108.   Plaintiffs are informed and believe, and thereon allege, that industrial activities at the Facility can contain pH-affecting substances; metals, such as aluminum; toxic metals, such as zinc and copper; TSS; O&G; and other chemical pollutants.

109.   Plaintiffs are informed and believe, and thereon allege, that industrial activities at the Facility occur outside without adequate cover or containment, resulting in discharges of polluted storm water and prohibited non-storm water.

110.   Plaintiffs are informed and believe, and thereon allege, that pollutants have been and continue to be carried offsite via non-storm water discharges including tracking and/or washing. Information available to Waterkeeper indicates that pollutants are tracked outside and/or washed off the Facility onto the driveway, sidewalk, and street outside of the Facility, where they may flow untreated to the Receiving Waters.

111.   Plaintiffs are informed and believe, and thereon allege, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

112.   Plaintiffs allege that Defendant has not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

113.   BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

114.   Plaintiffs are informed and believe, and thereon allege, that Defendant's failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility into the Receiving Waters in violation of the General Permit and the CWA.

115.   Plaintiffs are informed and believe, and thereon allege, that illegal discharges of polluted storm water negatively impact Plaintiffs' members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

**C.    The Facility's Storm Water Flow, Sampling Points, and Discharges to the Receiving Waters**

116.   Plaintiffs are informed and believe, and thereon allege, that storm water from the Facility discharges to a storm drain which ultimately discharges into the Santa Ana River in Riverside, which then discharges into the Pacific Ocean.

117.   The Facility's 2020 SWPPP indicates that the Facility has four outfalls where storm water discharges into. The SWPPP indicates that these outfalls are connected and pumped to a single discharge point where storm water sampling is collected for analysis.

118.   Plaintiffs allege, that the Santa Ana River and the Pacific Ocean are all waters of the United States. 33 U.S.C. § 1362(7).

**VI.    <u>DEFENDANT'S VIOLATIONS OF THE GENERAL PERMIT AND CWA</u>**

**A.    Defendant's Violations of the General Permit's Technology-Based Effluent Limitations**

119.   Plaintiffs are informed and believe, and thereon allege, that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility.

120.   Plaintiffs allege that storm water discharges from the Facility contain concentrations of pollutants associated with Defendant's industrial activities above EPA Benchmarks and incorporated into the General Permit as NALs.

121.   Plaintiffs allege that storm water discharges from the Facility contain concentrations of pollutants associated with Defendant's industrial activities that exceed annual NALs.

122.   Plaintiffs are informed and believe, and thereon allege, that storm water discharges from the Facility contain concentrations of pollutants with exceedances of

NALs for O&G, iron, zinc, and TSS.

123.    Plaintiffs are informed and believe, and thereon allege, that for the 2020-2021 reporting year, the Facility exceeded annual NALs for zinc and aluminum.

124.    Plaintiffs are informed and believe, and thereon allege, that for the 2020-2021 reporting year, the Facility did not stay within instantaneous maximum NAL parameters for pH.

125.    Plaintiffs are informed and believe, and thereon allege, that for the 2021-2022 reporting year, the Facility exceeded annual NALs for copper, zinc, and aluminum.

126.    Plaintiffs are informed and believe, and thereon allege, that for the 2021-2022 reporting year, the Facility did not stay within instantaneous maximum NAL parameters for pH.

127.    Plaintiffs are informed and believe, and thereon allege, that for the 2022-2023 reporting year, the Facility exceeded annual NALs for TSS, zinc, aluminum, and copper.

128.    Plaintiffs are informed and believe, and thereon allege, that for the 2022-2023 reporting year, the Facility did not stay within instantaneous maximum NAL parameters for pH.

129.    Plaintiffs are informed and believe, and thereon allege, that for the 2023-2024 reporting year, the Facility exceeded the annual NAL for zinc.

130.    Plaintiffs are informed and believe, and thereon allege, that had Defendant conducted additional sampling as required by the General Permit and CWA, the Facility would have shown additional NAL exceedances.

131.    Plaintiffs allege that the Facility's ongoing exceedances of applicable NALs and EPA Benchmarks demonstrate that Defendant has failed and continues to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards.

132.    For example, in Defendant's Level 1 ERA Report for Zinc for the 2022-2023 reporting period, Defendant proposes increased vacuuming and sweeping, a storm drain

filter, and filter socks as Advanced BMPs to achieve NALs. When these BMPs proved to be ineffective, as the Facility continued to exceed NALs for zinc the following reporting year, Defendant proposed the same BMPs of increased vacuuming and sweeping, a storm drain, and filter socks. Defendants added BMPs of cleaning and monitoring the storm weir, adding new flaps to the building, and a pre-rain checklist.

133.    Plaintiffs allege that the aforementioned BMPs do not satisfy the General Permit's BAT/BCT standards as evidenced by continued exceedances of annual NAL limitations for multiple reporting years, including through the present date.

134.    Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of the CWA.

135.    Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least April 25, 2020.

**B.  Defendant's Violations of the General Permit's Discharge Prohibitions**

136.    Plaintiffs are informed and believe, and thereon allege, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. For example, unauthorized non-storm water discharges occur at the Facility when washing activities and track-out occur and result in pollutants leaving the Facility enter the street and, ultimately, the Receiving Waters. Plaintiffs believe this may be occurring at the Facility due to the Facility's SWPPP stating that washing operations are occurring on the Facility and sumps are being cleaned by pressure washing at the Facility.

137.    Each time the Facility discharges materials other than storm water into the Receiving Waters is a separate and distinct violation of Discharge Prohibition III.B of the General Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

**C.  Defendant's Violations of the General Permit's SWPPP Requirements**

138.    The Facility's most recently updated SWPPP is publicly available via the

SMARTS database and is dated February 26, 2020.

139.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the General Permit.

140.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with Section X.G.2 of the General Permit. The SWPPP fails to conduct a full assessment of potential pollutant sources, including the degree, direct pathways, and indirect pathways by to which pollutants associated with those materials may be exposed to storm water. The SWPPP also fails to describe the effectiveness of existing BMPs and the estimated effectiveness of implementing minimum BMPs. General Permit § X.G.2.

141.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with Section X.G.1 of the General Permit. The SWPPP fails to describe the areas protected by contaminant structures and their corresponding containment capacity. General Permit § X.G.1.b.

142.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with Section X.A of the General Permit. The SWPPP fails to conduct a full analysis of minimum BMPs. For example, the SWPPP lacks a section on material handling and waste management. General Permit § X.A.

143.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with Section X.D of the General Permit. The SWPPP fails to identify the individuals and/or position responsible for implementing each BMP. General Permit § X.D.

144.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP fails to comply with the requirements of Section X.E of the General Permit. The Site Map fails to depict: nearby water bodies, the location of all industrial activities, the location where materials are directly exposed to precipitation, and shipping and receiving areas. The Site Map also fails to depict and locate structural control measures or storm water drainage

areas, including the location where the Facility conducts their sampling. General Permit § X.E.

145.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants.

146.   Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the General Permit and the CWA.

147.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in daily and continuous violation of the General Permit's SWPPP requirements since at least April 25, 2020.

**D.    Defendant's Violations of the General Permit's Monitoring Implementation Plan Requirements**

148.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP, in violation of the MIP requirements of the General Permit.

149.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to collect storm water discharge samples as required pursuant to Section XI.B.2 of the General Permit, which requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of each reporting year.

150.   Plaintiffs are informed and believe, and thereon allege, that in the 2020-2021 reporting year Defendant collected only three samples from QSEs when they were required to sample from four. Additionally, all three samples were taken during the second half of the reporting year. In the Facility's 2020-2021 Annual Report, Defendant stated that the reason for this was because there were minimal eligible storm events and that the

storm events that did occur were outside of business hours. However, Plaintiffs believe that storm events could not occur outside of business hours because Defendant claims to operate the Facility 24 hours per day 5 days per week in their SWPPP.

151.    Plaintiffs are informed and believe, and thereon allege, that in the 2022-2023 reporting year Defendant collected and analyzed storm water samples from a date that was not a QSE because it was not preceded by 48-hours with no discharge. Thus, Defendant failed to collect and analyze storm water discharges from one of the required QSEs during the second half of the 2022-2023 reporting year and thus did not collect the required amount of samples for the 2022-2023 reporting year.

152.    Plaintiffs are informed and believe, and thereon allege, that in the 2023-2024 reporting year Defendant again collected only three samples from QSEs when they were required to sample from four. Again, all three samples were taken during the second half of the reporting year. In the Facility's 2023-2024 Annual Report, Defendant again stated that there were minimal eligible storm events and that the storm events occurred outside of business hours, even though Defendant claims to operate the Facility 24 hours per day 5 days per week.

153.    Plaintiffs are informed and believe, and thereon allege, that Defendant has not collected the required number of storm water samples during QSEs in two reporting years within the relevant period.

154.    Plaintiffs are informed and believe, and thereon allege, that Defendant's reporting erroneously indicates that Defendant was unable to collect the required samples because there were insufficient rain events.

155.    Climatological data obtained from the National Oceanic and Atmospheric Administration ("NOAA") demonstrates that there were additional opportunities to sample significant rain events during each reporting year. See Exhibit 2 of Notice Letter attached hereto as Exhibit A.

156.    Defendant's failure to conduct sampling and monitoring as required by the

General Permit demonstrates that it has failed to develop, implement, and/or revise a MIP that complies with the requirements of Section XI of the General Permit.

157.    Plaintiffs are informed and believe, and thereon allege, that based upon the failure to collect the required number of samples, Defendant has failed and continues to fail to conduct and record adequate visual observations of storm water discharges since at least April 25, 2020 in violation of General Permit, Section XI.A.2.

158.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to conduct and record all required monthly dry weather visual observations at the Facility.

159.    Plaintiffs are informed and believe, and thereon allege, that Defendant has been in ongoing and continuous violation of the General Permit's monthly dry weather visual observation requirement since at least April 25, 2020.

160.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to conduct and record all required sampling event visual observations at the Facility.

161.    Plaintiffs are informed and believe, and thereon allege, that Defendant has been in ongoing and continuous violation of the General Permit's sampling event visual observation requirement since at least April 25, 2020.

162.    Plaintiffs are informed and believe, and thereon allege, that Defendant is in violation of the General Permit and the CWA because Defendant has failed and continues to fail to adequately develop, implement, and/or revise its MIP in violation of the General Permit's MIP requirements.

### E.    Defendant's Violations of the General Permit's Exceedance Response Actions Requirements

163.    Plaintiffs are informed and believe, and thereon allege, that based on storm water sample results submitted by Defendant, the Facility entered Level 1 status for pH following the 2018-2019 reporting year.

164.    Plaintiffs are informed and believe, and thereon allege, that the Facility entered Level 2 status for pH following the 2019-2020 reporting year.

165.    Plaintiffs are informed and believe, and thereon allege, that during the 2020-2021, 2021-2022, 2022-2023, and 2023-2024 reporting year, the Facility consistently remained in Level 2 for pH.

166.    Plaintiffs are informed and believe, and thereon allege, that the Level 2 ERA Action Plan Defendant submitted to SMARTS for pH on January 16, 2025 was both late and analyzed incorrect data. For example, the Action Plan analyzed data from 2022-2023 but was required to analyze data from the year in which they entered Level 2 which would be 2019-2020.

167.    Plaintiffs are informed and believe, and thereon allege, that Defendant submitted the identical ERA Action Plan for pH submitted on January 16, 2025 again on February 21, 2025 but titled the document "ERA Action Plan Report pH 2023-2024."

168.    Plaintiffs are informed and believe, and thereon allege, that the Facility entered Level 1 status for zinc following the 2018-2019 reporting year.

169.    Plaintiffs are informed and believe, and thereon allege, that the Facility entered Level 2 status for zinc following the 2019-2020 reporting year.

170.    Plaintiffs are informed and believe, and thereon allege, that during the 2020-2021, 2021-2022, 2022-2023, and 2023-2024 reporting years, the Facility consistently remained in Level 2 for zinc.

171.    Plaintiffs are informed and believe, and thereon allege, that the Level 1 ERA Report for zinc that Defendant uploaded to SMARTS was both late and analyzed incorrect data. For example, the first page of the Report states that it is for the 2022-2023 reporting year, but page seven of the report analyzes storm water sampling results from the 2017-2019 reporting years. Additionally, the file name of the document is titled, "ERA Report Zinc Total 2018-2019." The submission of this report is incorrect because Defendant entered Level 1 following the 2018-2019 reporting year and as a result, needed to submit

a Level 1 ERA Report analyzing that reporting year's data, not the 2017-2018 or 2022-2023 reporting years' data.

172.    Plaintiffs are informed and believe, and thereon allege, that the Level 2 ERA Technical Report Defendant submitted to SMARTS for zinc on April 4, 2025 was both late and nearly identical to their previously submitted Level 1 ERA Report for zinc. For example, page eight of the Level 1 ERA Report titled "Site Evaluation" is identical to page eight of the Level 2 Technical Report with the only difference being the change in title of the page to "Industrial Activity BMP Demonstration."

173.    Plaintiffs are informed and believe, and thereon allege, that Defendant did not upload a Level 2 Action Plan for zinc to SMARTS.

174.    Plaintiffs are informed and believe, and thereon allege, that based on storm water sample results submitted by Defendant, the Facility entered Level 1 status for aluminum following the 2021-2022 reporting year.

175.    Plaintiffs are informed and believe, and thereon allege, that the Facility entered Level 2 status for aluminum following the 2022-2023 reporting year.

176.    Plaintiffs are informed and believe, and thereon allege, that the Facility remained in Level 2 status for aluminum following the 2023-2024 reporting year.

177.    Plaintiffs are informed and believe, and thereon allege, that the Level 1 ERA Report for aluminum that Defendant uploaded to SMARTS on January 16, 2025 was both late and analyzed incorrect data. For example, the first page of the ERA Report states that it's for the 2022-2023 reporting year and the sampling data analyzes samples from the 2020-2022 reporting years.

178.    Plaintiffs are informed and believe, and thereon allege, that the Level 2 Action Plan for aluminum that Defendant uploaded to SMARTS on January 16, 2025 was both late and analyzed incorrect data. For example, the title of this document indicates it is for the 2023-2024 reporting period, but is analyzing samples from the 2022-2023 reporting year. Further, the Level 2 ERA Action Plan did not satisfy General Permit

requirements for such document, often parroting language from the earlier ERA document. For example, two pages, titled "Site Evaluation" in the Level 1 ERA Report and titled "Industrial Activity BMP Demonstration" in the Level 2 Action Plan contain identical information.

179. Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to take Exceedance Response Actions as required by General Permit Section XII.

180. Plaintiffs are informed and believe, and thereon allege, that Defendant has been in daily and continuous violation of the General Permit's Exceedance Response Actions requirements since at least April 25, 2020.

181. Plaintiffs are informed and believe, and thereon allege, that every day the Facility operates without satisfying General Permit's ERA requirements is a separate and distinct violation of the General Permit and the CWA, for which Defendant is liable.

## F.    Defendant's Failure to Comply with the General Permit's Reporting Requirements

182. Plaintiffs allege that for the past five years, Defendant has failed and continues to fail to submit Annual Reports that comply with the General Permit's reporting requirements.

183. Plaintiffs are informed and believe, and thereon allege, that in the Facility's Annual Reports for the 2019-2020 and 2020-2021 reporting years, Defendant stated that there were insufficient discharges to obtain the required amount of samples per reporting year despite evidence available to Plaintiffs to the contrary.

184. Plaintiffs are informed and believe, and thereon allege, that the Facility's 2021-2022 Annual Report stated that Defendant "updated" their technical report, but Defendant did not previously submit a technical report to SMARTS to update and did not specify which pollutant the report was being updated on.

185. Plaintiffs are informed and believe, and thereon allege, that in their 2022-

2023 Annual Report, Defendant stated that additional NAL exceedances occurred in the same drainage area for the Facility's Level 1 parameter(s). However, Defendant did not upload an updated Level 2 ERA Technical Report to SMARTS the following reporting year. While Defendant attempted to justify this by stating that there was a change in management at the facility, such a reason is not a permitted excuse under the General Permit.

186.    Plaintiffs are informed and believe, and thereon allege, that Defendant submitted inaccurate Annual Reports to SMARTS which fail to comply with the General Permit, and as a result, Defendant is in daily violation of the General Permit.

187.    Plaintiffs are informed and believe, and thereon allege, that Defendant has been in daily and continuous violation of the General Permit's annual reporting requirements every day since at least July 15, 2020.

188.    Every day Defendant conducts operations at the Facility without reporting as required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

## VII.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the General Permit's Technology Based Effluent Limitations**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

189.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

190.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT in violation of Effluent Limitation V.A of the General Permit and the CWA, 33 U.S.C. § 1311(b).   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or

BCT at the Facility is a daily violation of the General Permit and the CWA. General Permit, Effluent Limitation V.A.; 33 U.S.C. § 1311(b).

191.   Each day since April 25, 2020 that Defendant fails to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

192.   Defendant has been in violation of the BAT/BCT requirements every day since April 25, 2020. Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Non-Storm Water in Violation of the General Permit's Discharge Prohibitions
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

193.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

194.   Plaintiffs are informed and believe, and thereon allege, that Defendant's acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

195.   Every day since at least April 25, 2020 that Defendant has discharged and continues to discharge polluted non-storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## THIRD CAUSE OF ACTION
### Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Permit and the Clean Water Act
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

196.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

197. Plaintiffs are informed and believe, and thereon allege that, within the applicable statute of limitations, Defendant has failed and continues to fail to develop, implement, and/or revise an adequate SWPPP for the Facility, in violation of the General Permit.

198. Each day since February 26, 2020 that Defendant has failed to develop, implement, and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

199. Defendant has been in violation of the General Permit's SWPPP requirements every day since at least February 26, 2020. Defendant continues to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan in Violation of the General Permit and the Clean Water Act**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

200. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

201. Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendant failed and continues to fail to develop, implement, and/or revise an adequate MIP and monitoring program for the Facility, in violation of the General Permit.

202. Defendant's ongoing failure to develop, implement, and/or revise an adequate MIP and monitoring program is evidenced by, *inter alia*, Defendant's failure to collect and analyze samples from all storm water discharge locations at the Facility and failure to collect and analyze samples from all required QSEs.

203. Defendant has been in violation of the General Permit's monitoring requirements at the Facility every day from April 25, 2020 to the present.

204. Defendant will continue to be in violation of Section X(I) and XI of the

General Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

205.   Each day since at least April 25, 2020, that Defendant has failed to develop, implement, and/or revise an adequate MIP and monitoring program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Clean Water Act.

### FIFTH CAUSE OF ACTION
**Defendant's Failure to Satisfy Exceedance Response Requirements in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

206.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

207.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continue to fail to take Exceedance Response Actions as required by General Permit Section XII.

208.   Plaintiffs are informed and believe, and thereon allege, that even when Defendant did submit certain required ERA documentation during the applicable statute of limitations, such documentation failed to comply with requirements set out within the General Permit and CWA.

209.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in daily and continuous violation of the General Permit's Exceedance Response Actions requirements since at least April 25, 2020.

### SIXTH CAUSE OF ACTION
**Defendant's Failure to Comply with the General Permit's Requirement for Annual Reports**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

210.   Plaintiffs incorporate the allegations contained in the above paragraphs as

though fully set forth herein.

211.   Defendant has consistently failed to submit Annual Reports that comply with the requirements of Section XVI of the General Permit.

212.   Each day since at least April 25, 2020 that Defendant fails to prepare and submit adequate Annual Reports for the Facility is a separate and distinct violation of the General Permit and Section 310(a) of the Clean Water Act, 33 U.S.C. § 1311(a). This is an ongoing and continuous violation of the Clean Water Act.

## VIII.   RELIEF REQUESTED

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth and respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to comply with the MIP requirements of the General Permit, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendant to prepare a SWPPP for the Facility consistent with the requirements of the General Permit and implement procedures to regularly review and update the SWPPP;

g.   Order Defendant to provide Plaintiffs with reports documenting the quality and quantity of their discharges to the Receiving Waters and their efforts to

comply with the Clean Water Act and the Court's orders;

h.   Order Defendant to prepare and submit adequate ERA reports;

i.   Order Defendant to prepare and submit adequate Annual Reports;

j.   Order Defendant to pay civil penalties up to $68,445 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. § 19.4;

k.   Order Defendant to take appropriate actions to restore the quality of the water impaired or adversely affected by their activities;

l.   Award Plaintiffs' fees and costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

m.   Award any such other and further relief as this Court may deem appropriate.


Dated: June 24, 2025                    Respectfully submitted,

                                        /s/ Davina Shoumer
                                        Davina Shoumer
                                        Attorney for Plaintiff
                                        Orange County Coastkeeper
                                        Inland Empire Waterkeeper